# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TATIANA OSTROWIECKI,** *et al.* | **CIVIL ACTION** |
| **VERSUS** | **No. 07-6598** |
| **AGGRESSOR FLEET, LTD.,** *et al.* | **SECTION:  I/5** |
| **c/w** | |
| **SONDRA RUBIN,** *et al.* | **CIVIL ACTION** |
| **VERSUS** | **No. 07-6931** |
| **AGGRESSOR FLEET, LTD.,** *et al.* | ****This order only applies to Civil Action No. 07-6931.** |

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed on behalf of defendants, Aggressor Fleet Franchising, Inc. ("AFFI"), Aggressor Fleet, Ltd. ("AFL"), and Wayne Hasson ("Hasson") (collectively, "defendants"), to dismiss all claims for emotional distress and bystander damages brought by plaintiff, Lilith Rubin ("Lilith").[1]  Also before the Court is a motion for summary judgment filed on behalf of AFFI, AFL, and Hasson to dismiss all claims for emotional distress and bystander damages brought by plaintiff, Sondra Rubin ("Sondra").[2] For the following reasons, defendants' motions are **GRANTED IN PART** and **DENIED IN PART**.

---

[1] R. Doc. No. 70.

[2] R. Doc. No. 71.

### *BACKGROUND*

Israel Ostrowiecki ("Ostrowiecki"), Bruce Rubin ("Rubin"), and Rubin's daughter, Lilith,[3] were three of nineteen passengers on a ten-day cruise and recreational scuba diving expedition aboard the D/V OKEANOS AGGRESSOR ("OKEANOS").[4]  Ostrowiecki, Rubin, and Lilith boarded the OKEANOS on May 12, 2003, at Puntarenas, Costa Rica.[5]  Before traveling aboard a smaller vessel to the specific dive site, the divers would prepare aboard the OKEANOS for the daily dives.[6]

On May 16, 2003, Ostrowiecki, Rubin, and Lilith prepared for the second dive of the day and traveled from the OKEANOS to a dive site near the Cocos Islands, approximately three hundred miles off the coast of Costa Rica.[7]  Ostrowiecki, Rubin, and Lilith were three of nine divers on this particular dive.[8]  The dive was supervised by Randal Wright ("Wright"), an

---

[3] Ostrowiecki was a resident of Brazil, Rubin was a resident of New Mexico, and Lilith is allegedly a resident of both New Mexico and Louisiana.  R. Doc. No. 1-9, notice of removal, Ostrowiecki pet. ¶ 1; R. Doc. No. 1-9, notice of removal, Rubin second am. pet. ¶ 2; R. Doc. No. 49-5, mot. summ. j., ex. C, Lilith dep. at 9-12.

[4] Ostrowiecki pet. ¶¶ 12, 15; Rubin second am. pet. ¶¶ 2, 13.  The OKEANOS is allegedly owned and operated by Aventuras Maritimas Okeanos, S.A. ("AMO"), which is a Costa Rican corporation with its principal place of business and headquarters in San Jose, Costa Rica.  R. Doc. No. 74-3, AMO mot. to dismiss, ex. A, Randall Martinez Chinchilla aff. ¶¶ 3, 9; R. Doc. No. 74-3, AMO mot. dismiss, ex. A, Chinchilla second aff. ¶ 2.  At the time of this cruise, AMO was a franchisee of Aggressor Fleet Franchising, Inc. ("AFFI"), the franchisor for the Aggressor fleet; AFFI is a Louisiana corporation.  Chinchilla aff. ¶ 11; Ostrowiecki pet. ¶ 5.  AFFI assists in marketing cruises onboard the OKEANOS for diving off the coast of Costa Rica; AFFI also promulgates and enforces standards for the operation of OKEANOS cruises off the Costa Rican coast.  Chinchilla aff. ¶ 11.  Aggressor Fleet, Ltd. ("AFL"), also a Louisiana corporation, is the booking agent for scuba diving trips aboard vessels operating as Aggressor fleet franchisees, including the OKEANOS.  Ostrowiecki pet. ¶ 4.

[5] Ostrowiecki pet. ¶¶ 13, 14; Rubin second am. pet. ¶¶ 14, 17.

[6] Ostrowiecki pet. ¶ 14; Rubin second am. pet. ¶ 17.

[7] Ostrowiecki pet. ¶¶ 11, 15; Rubin second am. pet. ¶¶ 12, 19; R. Doc. No. 120-4, Rubin pls. opp'n, ex. C, David Inman dep. at 99.

[8] Ostrowiecki pet. ¶ 15; Rubin second am. pet. ¶ 19.

employee of the vessel owner, Aventuras Maritimas Okeanos, S.A. ("AMO"); Wright was employed as a dive master aboard the OKEANOS.[9]

Rubin and Lilith were dive buddies and among the last divers to enter the water.[10]  Lilith got into the water to wait for her father to enter and submerged about ten or fifteen feet.[11]  After submerging and clearing her ears, Lilith realized that she had drifted so far from the boat that she could not see the boat, her father, or any of the other divers.[12]  After entering the water, Lilith did not see her father again.[13]

Lilith encountered two other divers before surfacing, Maxine Barrett ("Barrett") and Robert Bondi ("Bondi"); the three divers surfaced together, but could not see the skiff.[14]  Bondi used a safety flag to signal the skiff, and, after five to ten minutes, the skiff came to pick up the divers.[15]

Lilith's dive lasted approximately thirty-five minutes.[16]  Several of the other divers allegedly aborted the dive early because of turbulent diving conditions.[17]  Fifty minutes after the dive began, seven of the nine divers, including Lilith, had returned to or been picked up by the

---

[9] R. Doc. No. 1-9, notice of removal, Ostrowiecki second am. pet.

[10] R. Doc. No. 71-5, mot. dismiss Sondra cls., ex. A, Lilith dep. at 20, 49.

[11] *Id.* at 50-56; R. Doc. No. 71-6, mot. dismiss Sondra's cls., ex. B, Lilith statement.

[12] Lilith dep. at 50-56; Lilith statement.

[13] Lilith dep. at 60.

[14] *Id.* at 50-56; Lilith statement.

[15] Lilith dep. at 50-56; Lilith statement.

[16] Lilith dep. at 67; R. Doc. No. 71-7, mot. dismiss Sondra's cls., ex. C, May 16, 2003, dive log.

[17] Ostrowiecki pet. ¶¶ 18-19; Rubin second am. pet. ¶ 22.

skiff.[18]  The vessel searched for forty-five minutes for the remaining divers, Ostrowiecki and Rubin, but to no avail.[19]  Ostrowiecki and Rubin disappeared at sea during this dive.[20]

Sondra learned of her husband's disappearance on May 16, around 5:00 p.m., when she received a phone call from Lilith.[21]  Lilith used Barrett's satellite phone because the OKEANOS phone was being used by Wright and the boat's captain to coordinate search efforts.[22]  Lilith told her mother that Rubin and another diver had not returned from the daily dive.[23]

Sondra heard from defendant Hasson for the first time on May 16 at around 10:30 p.m.[24]  Sondra asked Hasson for the satellite phone number aboard the OKEANOS, but was told she could not have it because the phone "was being used for communications with the Navy."[25]  Lilith was later able to use the satellite phone on the OKEANOS, but was unable to find the number to give to her mother.[26]

The OKEANOS discontinued its search for Rubin and Ostrowiecki at 2:00 a.m. on May 17.[27]  At the close of the search efforts by the OKEANOS, the scheduled diving trip continued

---

[18] Ostrowiecki pet. ¶ 20; Rubin second am. pet. ¶ 23.

[19] Ostrowiecki pet. ¶¶ 20-23; Rubin second am. pet. ¶¶ 23-26.

[20] Ostrowiecki pet. ¶¶ 11, 27; Rubin second am. pet. ¶¶ 12, 31.

[21] R. Doc. No. 71-9, mot. dismiss Sondra's cls., ex. E, Sondra dep. at 89-90.

[22] Lilith dep. at 79.

[23] *Id.*

[24] Sondra dep. at 92, 96.

[25] Sondra dep. at 97.

[26] *Id.*

[27] Lilith dep. at 86; R. Doc. No. 71-16, ex. L, Hasson dep. at 226-27; R. Doc. No. 120-6, ex. K, opp'n, Randal Wright dep. at 115-16; R. Doc. No. 70-5, ex. A, Jorge Berrocal dep. at 193.

with Lilith still on the boat,[28]  although she allegedly did not want to remain on the boat.[29]  The

passengers were not asked whether they wanted to continue diving.[30]

On May 17, Sondra started making attempts to get Lilith off of the OKEANOS; Sondra

made a number of proposals to Hasson to retrieve Lilith from the OKEANOS, including having

the vessel return to Costa Rica, sending a helicopter to the vessel, and sending a boat to the

vessel to pick her up.[31]  Each of these proposals was disapproved of or rejected by Hasson.[32]

---

[28] Inman dep. at 54; R. Doc. No. 120-6, opp'n, ex. M, Carla Gibson dep. at 76; R. Doc. No. 120-5, opp'n, ex. G, Nathan Purdee dep. at 66.

[29]
> Q  Did Lily Rubin want to continue the trip?
> A  Continue the trip?
> Q  Yes.
> A  Lily wanted to leave the boat.
> Q  Okay.  And how do you know that?
> A  I spent time with her.  Lily wanted to leave.
> Q  Okay.  And did she communicate that request to–
> A  To her mom, to me–to anyone else on the boat–she wanted to go.

Purdee dep. at 68; *see* C. Gibson dep. at 79.

[30] Inman dep. at 54; C. Gibson dep. at 76; Purdee dep. at 66.  David Gibson ("D. Gibson") testified:
> And it's my understanding that [Hasson] was the driving force at Headquarters that had absolutely no compassion for any of the passengers, and especially Lily Rubin, but he didn't have any compassion for–in my opinion, for the passengers at all.  I mean, we were stuck out there under horrible circumstances.
> And the word kept coming down, well, we're going to do this, this is from Headquarters.  Everything was from Headquarters, and basically we couldn't leave.

R. Doc. No. 120-6, opp'n, ex. N, D. Gibson dep. at 20.  At least some of the other passengers did not want to continue the diving trip:
> Generally people wanted to end the trip.  And I don't know exactly what was done about taking steps to do that, but I think generally the consensus was that the trip should be ended and we should go back to port.  If we're not going to search anymore, we should go back to port, was kind of the consensus.

*Id.* at 81.

[31] Sondra dep. at 101-103.

[32] *Id.*  Sondra's suggestions for getting Lilith off the OKEANOS were rejected for various reasons.  Lilith dep. at 98.  First, Hasson told Sondra that Lilith could not leave the ship because of "very bad weather." Sondra dep. at 102.  Sondra proposed that the OKEANOS be brought into shore, and Hasson told Sondra that the OKEANOS was still searching for Rubin, so she did not want to stop the search to bring the ship in. *Id.*  Sondra proposed getting Lilith off by helicopter, and Hasson informed her that a helicopter would not have the reach to make it to the OKEANOS.  *Id.* at 102-03.  Although a military helicopter would have the reach, Hasson questioned whether Sondra wanted to divert a helicopter from the search effort.  *Id.*  Sondra asked if a boat could pick up Lilith, and Hasson told

Lilith, for the remainder of her time on the OKEANOS, "spent a lot of time in her room. And she seemed pretty upset."[33]  One passenger described Lilith's emotional state as being in "shock."[34]  "She sat in the corner, by herself."[35]  One passenger went to Lilith's cabin and "heard her sobbing. . . .  [S]he was obviously traumatized."[36]  Lilith stated that the other passengers "didn't offer the type of emotional support that you would hope other people would."[37]

The OKEANOS returned to port on May 23, 2003.[38]  On May 30, 2003, the Tico Times, an English-language newspaper which had been covering the story, published an article by staff writer David Boddiger entitled "Diving Tragedy on Cocos Raises Questions."[39]  In that article, Hasson, among others, discussed the incident.  The article stated:

> "Both of these guys were assigned buddies," [Hasson] said. Rubin's dive buddy was his 19-year old daughter Lilith, whom Hasson also blamed for her father's disappearance.
> "The last people on the boat were Bruce and Lily (Rubin). I've confirmed this," he said.  According to Hasson, Lily entered the water and never waited for her father.  "She never even looked back," he said.  "She went down to join the others."

---

her that there were no boats out near the OKEANOS.  *Id.* at 103.  Sondra suggested bringing a boat down from San Diego, and Hasson told her that was too dangerous and "we'd have to stop searching."  *Id.*

[33] R. Doc. No. 120-7, ex. P, Cynthia Graham dep. at 65; *see* Lilith dep. at 137.

[34] Purdee dep. at 69.

[35] *Id.*

[36] C. Gibson dep. at 77-78.

[37] Lilith dep. at 137; *see* D. Gibson dep. at 83-84 ("[V]ery few people had anything to do with Lily, they mostly ignored Lily . . . .  [B]asically people tried their best just to ignore her.").

[38] Sondra dep. at 107-08.

[39] R. Doc. No. 114-10, ex. W; Lilith dep. at 101-02.

Sondra testified in her deposition that, after reading the article, she "wasn't sure whether [she] wanted to die or kill."[40]  Lilith, meanwhile, testified that she was "shocked, extremely upset, and outraged" by Hasson's comments in the article.[41]  She stated that she suffered, and continues to suffer, "profound bouts of sadness with chronic crying jags, anger, distrust of new people in [her] life, and fear of calamities being just around the corner."[42]

On November 5, 2003, the Ostrowiecki plaintiffs filed their petition in Orleans Parish Civil District Court against AFL, AFFI, Aggressors International, Ltd. ("AIL"),[43] AMO, Hasson,[44] Randall Martinez Chinchilla ("Chinchilla"),[45] and XYZ Insurer.[46]  Two days later, the Rubin plaintiffs also filed their petition in Orleans Parish Civil District Court against the same seven defendants.[47]

The Ostrowiecki and Rubin plaintiffs sought damages for defendants' negligence, breach

---

[40] Sondra dep. at 139-40.

[41] R. Doc. No. 278-2, ex. A, Lilith decl., at ¶3.

[42] *Id.* at ¶¶4-5.

[43] AIL allegedly assists in marketing for Aggressor Fleet franchisees, including the OKEANOS. Ostrowiecki pet. ¶ 6.  AIL was dismissed as a defendant from the lawsuit when the Louisiana Fourth Circuit Court of Appeal granted AIL's writ application with respect to personal jurisdiction.  R. Doc. No. 24-2, mem. supp. of joint mot. to remand at 7 n.4.

[44] Hasson is allegedly an owner of AIL and the Aggressor Fleet franchise "Operations Manager Captain" for all of the Aggressor fleet vessels, including the OKEANOS.  Ostrowiecki pet. ¶ 8.  Hasson is allegedly a resident of Florida and/or the Cayman Islands.  *Id.*

[45] Chinchilla is the president and a shareholder of AMO and a Costa Rican citizen.  Ostrowiecki pet. ¶ 9; Chinchilla aff. ¶ 2.  On May 30, 2008, the Court granted Chinchilla's motion to dismiss for lack of personal jurisdiction and dismissed all plaintiffs' claims against him.  R. Doc. No. 239.

[46] *Id.*

[47] *Rubin v. Aggressor Fleet, Ltd.*, Civil Action No. 07-6931, R. Doc. No. 1-6, notice of removal, ex. C, Rubin pet. (E.D. La. Oct. 9, 2007).

of contract, and misrepresentations.[48]  The Rubin plaintiffs also allege intentional infliction of

emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), and seek

bystander damages pursuant to Louisiana Civil Code article 2315.6.  In support of their

emotional distress and bystander claims, the Rubin plaintiffs allege that "Aggressor

representatives" confined Lilith to the OKEANOS following her father's disappearance and

continued the diving trip with her onboard the vessel, despite her father's disappearance.[49]  The

Rubin plaintiffs also allege that Hasson refused to furnish the telephone number of the

OKEANOS to Sondra and would not allow her to retrieve her daughter from the vessel.[50]

Finally, the Rubin plaintiffs contend that Hasson publicly blamed Lilith for the disappearance of

---

[48] Ostrowiecki pet. ¶¶ 34-51; Rubin second am. pet. ¶¶ 39-61.  On December 4, 2003, defendants removed the cases to this Court, claiming that the Death on the High Seas Act ("DOHSA") provided "the exclusive remedy for any person claiming damages as the result of death occurring on the high seas."  *Rubin v. Aggressor Fleet Ltd.*, Civil Action No. 03-3408, R. Doc. No. 1, notice of removal ¶ 5 (E.D. La. Dec. 4, 2003); *Ostrowiecki v. Aggressor Fleet Ltd.*, Civil Action No. 03-3409, R. Doc. No. 1, notice of removal ¶ 5 (E.D. La. Dec. 4, 2003).  The Ostrowiecki and Rubin plaintiffs filed a joint motion to remand, which the Court granted.

On May 6, 2004, the Ostrowiecki plaintiffs amended their petition to add Wright as a defendant.  On May 10, 2004, the Rubin plaintiffs added Wright as a defendant.  Ostrowiecki second am. pet.; Rubin first am. pet.  On June 17, 2004, the two lawsuits were consolidated by the Orleans Parish Civil District Court.  *Ostrowiecki v. Aggressor Fleet, Ltd.*, Civil Action No. 2003-16697 (Orleans Parish Civ. Dist. Ct. June 17, 2004).

On April 7, 2006, plaintiffs amended their joint petition to add three insurers, Certain Underwriters at Lloyds, London ("Lloyds"), Travelers Property Casualty Corporation ("Travelers"), and Shipowners' Mutual Protection and Indemnity Association (Luxembourg) ("Shipowners").  R. Doc. No. 24-4, joint mot. remand, ex. C, joint fourth am. pet.  Lloyds provided underwater liability insurance to defendants Wright, AFL, AFFI, Hasson, and AMO.  Travelers provided general commercial liability insurance to defendants AFL and Hasson.  Shipowners is a mutual marine protection and indemnity (P&I) association organized under the laws of Luxembourg with its managing agent in London, England.  R. Doc. No. 49-7, Shipowners mot., ex. E, Simon Swallow aff. ¶ 6.

The plaintiffs amended their joint petition again on July 23, 2007, adding an alternative claim pursuant to DOHSA, 46 U.S.C. §§ 30301-30308 (2006).  Notice of removal, ex. C, joint fifth am. pet.  On August 8, 2007, the Louisiana Fourth Circuit Court of Appeals held that DOHSA preempted plaintiffs' survival, wrongful death, misrepresentation, and breach of contract claims.  *Ostrowiecki v. Aggressor Fleet, Ltd.*, 965 So. 2d 527, 540 (La. Ct. App. 2007).  The court also held that the Rubin plaintiffs' intentional and/or negligent infliction of emotional distress claims were not preempted by DOHSA.  *Id.*

On October 9, 2007, Shipowners removed.  *See Ostrowiecki v. Aggressor Fleet, Ltd.*, Civil Action No. 07-6598, R. Doc. No. 1; *Rubin v. Aggressor Fleet, Ltd.*, Civil Action No. 07-6931, R. Doc. No. 1.  On December 12, 2007, this Court denied the plaintiffs' motion to remand.  R. Doc. No. 44.  On May 20, 2008, this Court granted Shipowners' motion for summary judgment and dismissed all of plaintiffs' claims against it.  R. Doc. No. 232.

[49] Rubin second am. pet. ¶ 56.

[50] *Id.*

-8-

her father.[51]

On February 8, 2008, the Aggressor defendants filed a motion for summary judgment on both Sondra's and Lilith's IIED, NIED, and bystander damages claims.

## LAW AND ANALYSIS

### I.      Standard of Law

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 266, 274 (1986).  The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case.  *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,'

---

[51] *Id.* ¶ 57.

'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211-12 (1986).  The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue.  *Id.*  The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S. Ct. 1545, 1551-52, 143 L. Ed. 2d 731, 741 (1999).

## II.   Discussion

### A.   DOHSA Preemption

DOHSA provides in pertinent part:

> When the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible.  The action shall be for the exclusive benefit of the decedent's spouse, parent, child, or dependent relative.

46 U.S.C. § 30302.  In order for DOHSA to apply, the acts causing the death need not occur on the high seas as long as the death itself occurs there.  *Motts v. M/V Green Wave*, 210 F.3d 565, 569 (5th Cir. 2000).  Rubin disappeared on the high seas and, therefore, DOHSA applies to this lawsuit.

The Supreme Court has held that DOHSA limits recovery to "a fair compensation for the

pecuniary loss sustained by the individuals for whose benefit the action is brought."  46 U.S.C. §
30303; *see Dooley v. Korean Air Lines Co.*, 524 U.S. 116, 122, 118 S. Ct. 1890, 1894, 141 L.
Ed. 2d 102, 108 (1998).  "DOHSA does not authorize recovery for the decedent's own losses,
nor does it allow damages for nonpecuniary losses."  *Dooley*, 524 U.S. at 122.

In *Mobil Oil Corp. v. Higginbotham*, the United States Supreme Court stated that when
DOHSA speaks directly to an issue, "courts are not free to 'supplement' Congress' answer."
436 U.S. 618, 625, 98 S. Ct. 2010. 2015, 56 L. Ed. 2d 581, 587(1978).  Because DOHSA
specifically addresses which damages are recoverable for deaths occurring on the high seas, the
Supreme Court held that general maritime law could not supplement a DOHSA remedy, and,
therefore, nonpecuniary damages were not recoverable.  *Id.*  The Court explained:

> Congress did not limit DOHSA beneficiaries to recovery of their
> pecuniary losses in order to encourage the creation of nonpecuniary
> supplements.  There is a basic difference between filling a gap left by
> Congress' silence and rewriting rules that Congress has affirmatively
> and specifically enacted.

*Id.* (citations omitted).  Therefore, where DOHSA applies, nonpecuniary damages may not be
recovered pursuant to general maritime or state law.  *Id.*; *Zicherman v. Korean Air Lines Co.*,
516 U.S. 217, 230, 116 S. Ct. 629, 636, 133 L. Ed. 2d 596, 608 (1996) (noting that when
DOHSA applies, neither state law nor general maritime law can provide a basis for recovery of
nonpecuniary damages).  *Higginbotham* addressed the scope of remedies available under
DOHSA, leaving open the question whether recovery pursuant to state statutes is preempted by
DOHSA.

The Supreme Court addressed that question with respect to a state wrongful death statute

-11-

in *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S. Ct. 2485, 91 L. Ed. 2d 174 (1986). The Court held that when DOHSA applies, it preempts state wrongful death statutes because it was Congress's purpose to make a uniform provision for recovery for wrongful deaths on the high seas. *Id.* at 232-33. The Court specifically left open the question of whether a state survival statute could supplement DOHSA. *Id.* at 215 n.1.

In *Dooley*, the Court addressed that question, holding that "[b]y authorizing only certain surviving relatives to recover damages, and by limiting damages to the pecuniary losses sustained by those relatives, Congress provided the exclusive recovery for deaths that occur on the high seas." 524 U.S. at 123. Therefore, a plaintiff may not supplement his DOHSA claim with a survival claim brought under general maritime law. *Id.* at 124. In addition to preempting maritime law survival actions, DOHSA preempts state law survival causes of action. *Jacobs v. N. King Shipping Co.*, 180 F.3d 713, 719 (5th Cir. 1999).

### 1.      IIED and NIED Claims

Defendants argue that DOHSA preempts any cause of action that arises out of or relates to a death on the high seas.[52] Plaintiffs respond that DOHSA preemption is limited to situations where the state law claims are based on the very same conduct that caused the underlying death on the high seas, and that their IIED and NIED claims are premised upon entirely independent sets of facts from those that caused Rubin's death.[53]

The Court's research has disclosed two cases where federal district courts have ruled that

---

[52] R. Doc. No. 71-3, mem. supp., at 5-6.

[53] R. Doc. No. 120, mem. opp'n, at 37.

state law IIED and NIED claims are preempted by DOHSA.[54]  In *Rux v. Republic of Sudan*, 495

F. Supp. 2d 541 (E.D. Va. 2007), the plaintiffs were family members of the seventeen sailors

who died in the October 2000 attack on the U.S.S. Cole.  *Id.* at 545-47.  Among other claims,

they sought damages for "emotional distress experienced upon learning of the attack against the

Cole."  *Id.* at 563.  The court ruled that the claims were preempted by DOHSA, which "limits

compensation 'to prospective and material loss for the relief of others than the decedent — to

reimbursement for the post-death "pecuniary" deprivation of his dependents.'"  *Id.* at 563

(quoting *United States v. Washington*, 172 F. Supp. 905, 908 (D. Va. 1959)).

Meanwhile, in *Howard v. Crystal Cruises, Inc.*, No. 91-642, 1992 WL 194659 (E.D. Cal.

Mar. 13, 1992), the decedent died from a blood clot caused by the defendant's negligence on the

high seas.  *Id.* at *1.  The plaintiffs, decedent's wife and son, sought to amend their complaint to

allege negligent infliction of emotional distress.  The court denied their request, concluding that

"DOHSA is intended to compensate the families of the decedents, and it has failed to provide for

emotional distress damages."  *Id.* at *6.  As a result, the court held that a NIED claim "is clearly

precluded under DOHSA."  *Id.*

Both *Rux* and *Howard* addressed claims of emotional distress flowing from the

defendants' actions that caused the deaths on the high seas.  The mental anguish damages sought

in those cases were caused by the same wrongful acts that entitled the plaintiffs to recovery

under DOHSA.  Here, Lilith and Sondra do not claim emotional suffering flowing from those

---

[54] The Ninth Circuit has reviewed an IIED claim on its merits in a case where DOHSA otherwise applied. *See Wallis v. Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002).  Because the IIED claim failed on the merits, however, the Court expressly stated that it "[did] not need to reach [defendants'] . . . argument that the claim is preempted by DOHSA."  *Id.* at 842.  The Court's research discloses no other circuit court of appeals that has considered the issue.

acts that caused Rubin's death, but from altogether separate and discrete acts by defendants. Surely, Rubin's death and the alleged acts that caused it brought considerable mental anguish to Lilith and Sondra.  But they do not seek legal relief for that anguish — indeed *Rux* and *Howard* hold that they could not.  Instead, the anguish for which they seek recovery is separable from the death-related anguish, and it is predicated on entirely different acts of defendants from those which allegedly caused Rubin's death.

The text of DOHSA also militates against preemption of plaintiffs' claims.  The injury which triggers DOHSA's application is "the death of an individual . . . caused by wrongful act, neglect, or default occurring on the high seas."  46 U.S.C. § 30302.  The alleged emotional injuries suffered by plaintiffs, as well as their causes, are entirely separable from the alleged causes of Rubin's death — the wrongful acts, neglect, or default of defendants.  Plaintiffs' injuries, therefore, do not fall within the ambit of the statute.  DOHSA's text does not "speak directly to [the] question," *Higginbotham*, 436 U.S. at 625, of recovery for emotional suffering flowing from defendants' discrete, post-death actions.  Permitting plaintiffs' state law claims to go forward does not, therefore, offend "Congress' considered judgment."  *Id.*  To rule otherwise would enable defendants to escape liability for any emotional distress inflicted in the wake of a death on the high seas.  Were this Court to accept defendants' argument, defendants could engage in any manner of deplorable conduct without incurring legal liability, so long as their conduct arose out of or was somehow related to a death on the high seas.  The Court does not interpret DOHSA to have such sweeping preemptive effect.

Finally, the Court acknowledges defendants' argument that the Supreme Court has repeatedly interpreted DOHSA to preclude on preemption grounds supplementary state law

-14-

claims.[55]  The causes of action barred by the Supreme Court in *Higginbotham*, *Tallentire*, and

*Dooley*, however, provide remedies for injuries flowing from the death itself.  Put simply, in

their IIED and NIED claims, plaintiffs are not trying to recover for a death on the high seas, but

for emotional injuries suffered as a result of independent, separable acts of defendants.  DOHSA

does not apply to those alleged injuries suffered by Sondra and Lilith and, therefore, will not

preempt their claims.

        **2.**       **Bystander Damages**

       Sondra and Lilith seek damages pursuant to Louisiana Civil Code article 2315.6, which

provides:

> A.  The following persons who view an event causing injury to another person, or who come upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that they suffer as a result of the other person's injury:
>
>     (1) The spouse, child or children, . . . .
>
> B.  To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable.  Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.

Defendants argue that plaintiffs' claim is preempted because it is premised on the injury (that is,

the death) of Rubin, and, therefore, such claim would impermissibly entitle plaintiffs to

nonpecuniary damages.  Sondra and Lilith argue that their bystander claim is *sui generis*, neither

---

[55] R. Doc. No. 71-3, mem. supp., at 5.

a survival action to recover for injuries to Rubin, nor a wrongful death claim for losses they suffered as a result of his death.[56]

Unlike the IIED and NIED claims, the cause of action authorized by article 2315.6 compensates plaintiffs for injuries flowing from the same acts that caused the decedent's death. Awarding bystander damages in this case would provide Sondra and Lilith with nonpecuniary damages, which were expressly barred by the Supreme Court in *Tallentire*. By enacting DOHSA, "Congress has 'struck the balance . . .' in determining that survivors should be restricted to the recovery of their pecuniary losses." *Tallentire*, 477 U.S. at 232 (quoting *Higginbotham*, 426 U.S. at 625). The Court recognizes that the plaintiffs in *Tallentire* were not present when the decedents died, whereas Lilith was at least in the vicinity of her father when he disappeared, thereby arguably enhancing her degree of suffering at her father's death. Though the injury to Lilith could, therefore, be distinguished from the injury to the *Tallentire* plaintiffs, the alleged *cause* of their respective injuries is equivalent — to wit, the acts that caused the deaths.

Louisiana's bystander damages statute simply codifies an emotional distress cause of action when the plaintiff happens to bear witness to the event causing injury. The acts causing the underlying injury to the primary victim are by necessity inseparable from those that emotionally injure the witness-plaintiff. Because the bystander cause of action arises out of acts that allegedly caused a death on the high seas, the Court finds that plaintiffs' claims under article 2315.6 are preempted by DOHSA.

---

[56] R. Doc. No. 120, mem. opp'n, at 38-39.

B.      *Choice of Law*

1.      **Lilith's Claims**

Defendants assert that Lilith waived any claims for IIED and/or NIED when she signed the "Release of Liability & Responsibility Agreement" (the "Release Agreement"), which contained a waiver clause, prior to embarking on the trip.[57]  Plaintiffs respond that the Release Agreement is invalid under Louisiana law or, in the alternative, is insufficiently specific to release defendants from liability for Lilith's emotional distress claims.[58]

a.      Law Applicable to the Contract

As an initial matter, it must be determined whether the Release Agreement is a maritime contract, whose interpretation is governed by federal maritime law, or a contract governed by some other body of law.[59]  Defendants contend that the contract is a maritime contract.[60]  Plaintiffs' position is somewhat more ambiguous, as the bulk of their argument focuses on the choice-of-law provision rather than the character of the contract itself.

"Whether a particular contract can be characterized as maritime depends on the nature and character of the contract, not on the situs of its performance or execution."  *Theriot v. Bay*

---

[57] R. Doc. No. 70-30, ex. Z.  Defendants state that Lilith executed the Release Agreement "prior to departure and participation on the diving expedition."  R. Doc. No. 70-3, mem. supp., at 18.  The Court notes, however, that the handwritten date next to Lilith's signature on both the Aggressor Fleet Application and the Release Agreement is "05/13/03," i.e., the day *after* Lilith boarded the OKEANOS.  Because plaintiffs do not dispute defendants' characterization of the date of execution, the Court declines to investigate any legal impact it would have on the contract's validity.

[58] R. Doc. No. 120, mem. opp'n, at 42-43.

[59] The choice-of-law provision, to be discussed in greater detail *infra*, concerns only the substantive law to be applied to claims against AFL, and not to the law under which the contract itself must be interpreted.

[60] R. Doc. No. 70-3, mem. supp., at 19.

*Drilling Corp.*, 783 F.2d 527, 538 (5th Cir. 1986).  "A maritime contract is '[a] contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment[.]'" *J.A.R., Inc. v. M/V Lady Lucille*, 963 F.2d 96, 98 (5th Cir. 1992) (quoting *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 954 (5th Cir. 1988)).  The subject matter of the Release Agreement in this case involves a commercial vessel, the OKEANOS, voyaging on  navigable waters and providing diving services to its passengers for a fee.  *See Kuntz v. Windjammer Barefoot Cruises, Ltd.*, 573 F. Supp. 1277, 1280 (W.D. Pa. 1983) (determining that a scuba diving accident related to maritime commerce); *see also Courtney v. Pacific Adventures, Inc.*, 5 F. Supp. 2d 874, 878 (D. Haw. 1998) (concluding that a diving accident bore a "substantial relationship to traditional maritime activity" when the dive master "negligently selected a location to anchor, failed to display a proper dive flag, failed to communicate with another vessel, failed to mark the anchor line properly, and failed to keep or use adequate emergency equipment").   A number of courts have treated contracts between dive operators and their customers as maritime contracts subject to federal law.  *See, e.g.*, *Murley v. Deep Explorers, Inc.*, 281 F. Supp. 2d 580, 588-89 (E.D.N.Y. 2003); *Cutchin v. Habitat Curacao-Maduro Dive Fanta-Seas, Inc.*, No. 98-1679, 1999 WL 33232277, at *2 (S.D. Fla. Feb. 8, 1999).  In light of the foregoing precedent and the subject matter of the Release Agreement, the Court finds that it is a maritime contract, to be governed by federal maritime law.

       b.      Choice-of-Law Provision

     Notwithstanding its status as a maritime contract, the Release Agreement contains a choice-of-law provision designating Louisiana law as the substantive law to be applied to any claims against AFL.  The provision states as follows:

JURISDICTION AND APPLICABLE LAW: All claims against
Aggressor Fleet, Ltd. arising under, in connection with, or incident
to this agreement shall be determined according to the laws of
Louisiana and shall be adjudicated in the courts of Louisiana, to
the exclusion of the courts of any other state or county.[61]

"[W]here the parties specify in their contractual agreement which law will apply, admiralty
courts will generally give effect to that choice." *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 916
(9th Cir. 2003). The Fifth Circuit has provided guidance on the question of when a choice-of-
law provision will be given effect. "[I]f the parties to a [maritime] contract have included a
choice-of-law clause, and the state has a strong public policy favoring the application of its law,
the state's law will govern unless the state has no substantial relationship to the parties or the
transaction, or the state's law conflicts with the fundamental purposes of maritime law." *In re
BSI Drilling & Workover, Inc.*, 137 F.3d 1351, 1998 WL 92464, at *1 (5th Cir. 1998).

Louisiana courts in prior cases have not impeded the application of state law pursuant to
a choice-of-law clause in a maritime contract. *See, e.g.*, *Ridings v. Danos & Curole Marine
Contractors, Inc.*, 723 So.2d 979, 982 n.1 (La. Ct. App. 4th Cir. 1998) (applying Louisiana law,
rather than federal maritime law, when the underlying contract contained a Louisiana choice-of-
law clause). The Louisiana Supreme Court itself has deferred to federal maritime law on the
question of whether choice-of-law provisions are valid. *See Lejano v. Bandak*, 705 So.2d 158,
164 (La. 1997) ("Consensual adjudicatory procedure denotes the ability of potential or
prospective litigants to choose, in advance of any litigation, the court that will hear the dispute
and the law that will govern the substantive merits of the litigation.") "[V]alidity and
interpretation of choice-of-law clauses in maritime contracts *is also a matter of federal law*." *Id.*

---

[61] R. Doc. No. 70-30, ex. Z.

-19-

(emphasis added).  The Court concludes that Louisiana policy favors the application of state law.

Louisiana also has substantial relationships with the parties in this case: AFL's main office is based in Morgan City, Louisiana, Hasson traveled regularly to Louisiana on business, and Lilith Rubin was a student in Louisiana at the time of the accident.  Finally, there is no conflict between Louisiana law and the "fundamental purposes of maritime law."[62]  *In re BSI Drilling*, 1998 WL 92464, at *1.  The choice-of-law provision is, therefore, valid and enforceable.

The parties also dispute the scope of the provision, whose text expressly refers only to claims against AFL.

Defendants contend that this provision dictates the application of Louisiana law to claims against AFL, and AFL alone.[63]  Plaintiffs argue that the language "arising under, in connection with, or incident to this agreement" contained in the provison  is broad enough to encompass their claims against not only AFL, but all defendants.  Plaintiffs ignore the fact that the cited language merely modifies the preceding phrase of the clause: "All claims against Aggressor Fleet, Ltd."  Accordingly, the choice-of-law provision applies only to the extent that Lilith has claims against AFL.  Louisiana law, therefore, applies to Lilith's IIED and NIED claims against AFL.  The Court must now determine which law applies to Lilith's claims against AFFI and Hasson.

---

[62] Defendants assert, without explanation, that the application of Louisiana law "conflicts with the fundamental purpose of DOHSA and federal maritime law."  R. Doc. No. 173, reply mem. supp., at 16.  As explained above, DOHSA does not apply to Lilith's claims for emotional distress because they are predicated on independent acts of defendants.  Applying Louisiana law to those claims does not, therefore, conflict with the fundamental purpose of DOHSA, which is to compensate the statutory beneficiaries for wrongful acts causing death on the high seas.  Defendants identify no convincing reason why federal maritime law conflicts with the application of Louisiana law.

[63] R. Doc. No. 173, reply mem. supp., at 16.

c.      Waiver Provision

Defendants contend that Lilith waived any IIED and NIED claims when she signed the

Release Agreement.[64]  Plaintiffs argue that the waiver provision is invalidated by Louisiana Civil

Code article 2004.  The waiver clause states:

> I hereby waive, release, and absolve the Released Parties of and
> from any all (sic) liability and responsibility for personal injury,
> property loss, death, and any and all other damages that I may
> sustain in connection of (sic) or arising out of my participation in
> the trip for which I have applied and the activities made available
> in connection therewith, whether such injuries, losses or damages
> result from negligence, products liability, strict liability,
> unseaworthiness of the vessel, or fault of any of the RELEASED
> PARTIES.  I further agreed (sic) to defend, indemnify, and hold
> harmless the RELEASED PARTIES from any claim or lawsuit by
> me or anyone purporting to act on my behalf for any such personal
> injury, property loss, death, or other damages.[65]

The "RELEASED PARTIES" are defined as: "Aggressor Fleet, Ltd., Aggressor Fleet

Franchising, Inc., its Franchisees, the Vessel, the Vessel Owners, charterers and operators of the

vessel, and their officers, directors, shareholders, agents, employees and affiliated companies."

*Id.*  Because differing bodies of law — federal maritime law and Louisiana law — apply to

Lilith's claims against, respectively, defendants AFFI and Hasson and defendant AFL, the Court

must treat the validity of the waiver provision as two separate inquiries.

i.      AFFI and Hasson (Maritime Law)

"[W]ithin admiralty law, the doctrine prohibiting a party from completely absolving itself

from liability for its own negligence is limited to circumstances involving relationships similar to

---

[64] R. Doc. No. 70-3, mem. supp., at 18-20.

[65] R. Doc. No. 70-30, ex. Z.

-21-

towage agreements, such as bailment, employment, or public service relationships." *Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 719 (8th Cir. 2003). None of those identified exceptions apply here. Generally, "a well-drafted pre-accident waiver or release will absolve a defendant from liability in a diving case if he can show: 1) the clause was knowingly agreed to and clearly spelled out the dangers of diving (i.e., there was informed consent); 2) the clause was not inconsistent with public policy; and, 3) the clause does not constitute an invalid adhesion contract." Phyllis G. Coleman, *Scuba Diving Injuries: Causes, Remedies, and Defenses*, 29 J. MAR. L. & COM. 519, 559 (1998).

First, there is no evidence that Lilith did not give her informed consent to waive any liability of defendants, and plaintiffs do not argue that such consent was lacking. The Release Agreement signed by Lilith states: "I further certify that I have informed myself of and fully understand the risks inherent in snorkeling, scuba diving and other open water activities, and travel to and from dive sites and I expressly assume all risks involved in such activities."[66] The clause warns of the "risks inherent" in diving. As an experienced diver, Lilith knew or should have known what those risks were. The Court finds that Lilith gave her informed consent.

Second, liability releases are not inconsistent with public policy. The Fifth Circuit has stated that maritime indemnity provisions will be construed to preclude liability for losses and damages "which reasonably appear to have been within the contemplation of the parties." *Theriot*, 783 F.2d at 540 (quoting *Seal Offshore, Inc. v. Am. Standard, Inc.*, 736 F.2d 1078, 1081 (5th Cir. 1984)).

Finally, plaintiffs do not contend that the Release Agreement is a contract of adhesion.

---

[66] R. Doc. No. 70-30, ex. Z.

Several courts have spoken directly to the issue, concluding that there is "nothing inherently unfair in the mandatory use of waivers in recreational sporting events such as scuba diving." *Olivelli v. Sappo Corp., Inc.*, 225 F. Supp. 2d 109, 119 (D.P.R. 2002); *see also Cutchin*, 1999 WL 33232277, at *4.

Defendants cite several cases in which liability waivers similar to the one in the instant case have been upheld.[67]  *See Delponte v. Coral World V.I., Inc.*, No. 2002-216, 2006 WL 2403331 (D.V.I. Aug. 14, 2006); *Murley*, 281 F. Supp. 2d at 590; *Olivelli*, 225 F. Supp. 2d at 120 (upholding a liability waiver under either state or federal common law in a scuba diving case); *Cutchin*, 1999 WL 33232277, at *3-4 (noting that courts enforcing releases in scuba diving cases have held "that they completely barred lawsuits grounded on the dive company's negligence").  Notably, defendants argue that by signing the Release Agreement, Lilith waived all claims for emotional distress, including any cognizable claim based on defendants' intentional conduct.  However, in the cases cited, the waivers were upheld only to the extent they precluded claims based on negligent conduct by the defendants.  For instance, in *Murley*, the court found the plaintiff to have released defendants "from liability for their own *negligence*." *Murley*, 281 F. Supp. 2d at 590 (emphasis added); *see also Cutchin*, 1999 WL 33232277, at *4 ("Waivers and exculpatory clauses are valid and enforceable if the intent to relieve a party from his own *negligence* is clear." (emphasis added)).

By its own terms, the waiver provision waives claims resulting "from negligence, products liability, strict liability, unseaworthiness of the vessel, or fault of any of the RELEASED PARTIES."  The next sentence of the waiver provision states: "I further agreed

---

[67] R. Doc. No. 173, reply mem. supp., at 15-18.

(sic) to defend, indemnify, and hold harmless the RELEASED PARTIES from *any claim or lawsuit* by me or anyone purporting to act on my behalf for any such personal injury, property loss, death, or other damages."[68]  To the extent that this sentence purports to waive defendants' liability for intentional conduct, it is invalid.  "A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."  RESTATEMENT (SECOND) OF CONTRACTS § 195(1) (1981); *see also Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir.) (ruling that waiver provisions that exempt liability for harm wilfully inflicted are invalid).  The Court concludes that, with respect to AFFI and Hasson, Lilith waived her claims for negligent infliction of emotional distress by signing the Release Agreement.  To the extent that she has legally cognizable claims for intentional infliction of emotional distress, she may continue to assert those claims against AFFI and Hasson, notwithstanding the waiver provision.

ii.	AFL (Louisiana Law)

Article 2004 of the Louisiana Civil Code provides:

> Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.
> Any clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party.

The effect of this article on the waiver provision present several distinct issues: 1) whether the waiver provision offends article 2004; 2) whether the existence of offending language nullifies the entire provision, or merely the offending language; 3) if the provision survives, whether it

---

[68] R. Doc. No. 70-30, ex. Z. (emphasis added)

has a preclusive effect on Lilith's IIED and NIED claims.  The Court considers these issues in turn.

First, the plain text of the waiver provision of the Release Agreement indicates that it contains a clause that limits defendants' liability "for causing physical injury to the other party." La. Civ. Code. art 2004.  It purports to release defendants from liability "for personal injury . . . and any and all other damages . . . that [Lilith] may sustain in connection of (sic) or arising out of [her] participation in the trip."[69]  Physical injury would fall within the category of either "personal injury" or "any and all other damages" for which the waiver seeks to limit liability. Further, the waiver provision contains a clause which attempts to "exclude[] or limit[] the liability of one party for intentional or gross fault."  *Id.*  The final sentence of the provision seeks to indemnify defendants "from *any claim or lawsuit*,"[70] without regard to the predicate conduct underlying such claim.  This sentence of the waiver provision purports to exclude liability, by way of Lilith's indemnification, for all of her claims, including those based on intentional or gross fault.  The Court concludes that the waiver provision offends both prongs of article 2004.

Second, the Court must determine whether a violation of article 2004 compels a court to nullify the entire waiver provision — i.e., the final two sentences of the fourth paragraph of the Release Agreement — or to merely excise any offending language relating to physical injury or intentional or gross fault.  Neither the parties nor the Court have identified a Louisiana case speaking directly to this question.  Defendants insist that any offending portions of the provision may be stricken, and that any remaining language is enforceable.  Plaintiffs contend that the

---

[69] R. Doc. No. 70-30, ex. Z.

[70] R. Doc. No. 70-30, ex. Z (emphasis added).

violation of article 2004 renders the entire waiver provision (both sentences) invalid.[71]  The critical issue is the meaning of article 2004's directive that "[a]ny clause is null" that limits liability based on intentional fault or gross fault or for physical injury.

To begin with, plaintiffs' citation to Louisiana Civil Code article 2034 is not persuasive.[72]  That article protects the integrity of an overall contract when a provision has been nullified. Contrary to plaintiffs' assertion, it does not stand for the proposition that "the nullity of one part of a particular clause does render the rest of the clause null."[73]  Notably, article 2004 refers to the nullification of any "clause."  The parties appear to agree, as does the Court, that nullification means the voiding of language in a contract such that the nullified language is unenforceable.

Plaintiffs, meanwhile, argue that article 2004's reference to nullification of a "clause" means that a court may strike particular language, but that the surviving provision must still make grammatical sense.  In other words, a court may not reinterpret the *meaning* of an offending provision such that it conforms to the strictures of article 2004.  Instead, a court is limited to the nullification of *language*; any reformation of meaning is beyond the scope of the nullification remedy authorized by the article.  Plaintiffs further contend that a court may not pick and choose offending terms from a provision, but is instead limited to striking out an entire clause — that is, a group of words containing a subject and predicate within a sentence or

---

[71] R. Doc. No. 120, mem. opp'n, at 44 & n.17.

[72] Louisiana Civil Code article 2004 states: "Nullity of a provision does not render the whole contract null unless, from the nature of the provision or the intention of the parties, it can be presumed that the contract would not have been made without the null provision."

[73] R. Doc. No. 120, mem. opp'n, at 44 n.117.

provision.[74]  The only coherent result of nullification, plaintiffs urge, is invalidation of the waiver provision *in toto*.

Defendants take the position that, under article 2004, a court possesses at least the authority to selectively invalidate offending language while retaining the lawful aspects of a waiver provision.  They have referred the Court to *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So. 2d 294 (La. 2001), for the proposition that a court may nullify and excise offending language of a provision without invaliding the provision in its entirety.  In that case, the Louisiana Supreme Court addressed the applicability of Louisiana Revised Statutes § 23:921 to an overbroad noncompete provision.  *Id.* at 308.  The statute contained similar language to article 2004, rendering "[e]very contract, or agreement, or provision thereof . . . null and void" if it was intended to restrain trade.  La. Rev. Stat. Ann. § 23:921(A)(1) (2008).  Confronted with an overbroad noncompete provision, the court concluded that it was "possible to excise the offending language from the noncompetition clause without doing undue damage to the remainder of the provision."  *SWAT 24*, 808 So. 2d at 309.  A Louisiana statute declaring a provision null, argue defendants, does not necessarily preclude a court from rescuing the valid portions of a provision, while striking the offending portions.  Plaintiffs argue that *SWAT 24* is

---

[74] The terms "clause" and "provision" are frequently used interchangeably in the realm of judicial interpretation of contracts.  For instance, article 2004 refers to a "clause," whereas article 2034, codified by the same legislative act as article 2004, *see* Acts 1984, No. 331, § 1, refers to the effect on a contract of a nullified "provision."  Meanwhile, BLACK'S LAW DICTIONARY provides circular definitions of the two terms:

> **clause**, *n.*  **1.**  A distinct section or provision of a legal document or instrument . . . .
> **provision.  1.**  A clause in a statute, contract, or other legal instrument . . . .

BLACK'S LAW DICTIONARY 267, 1262 (8th ed. 2004); *see also* RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 251, 1087 (McGraw Hill ed. 1991) (defining "clause" as "a distinct article or provision in a contract," and defining "provision" as "a clause in a law, legal instrument, etc., providing for something").  The Court finds the distinction, though not without linguistic significance, nondispositive of the question currently before it.

-27-

not on point for the very reason that the court was able to excise specific terms *without* doing

violence to the valid aspects of the noncompete clause.

The Court concludes that *SWAT 24*, though persuasive, is distinguishable from the case at

hand.  First, the "undue damage" that the *SWAT 24* court was able to avoid is not possible in this

case.  Based on its current phrasing, the Court would effectively be required to rewrite the

Release Agreement's waiver provision to bring it into compliance with article 2004.  Second, the

*SWAT 24* court relied on the specific terms of a severability provision contained in the agreement

in question.  *Id.*  That severability provision provided:

> In the event of any of [sic] provisions, paragraphs *or portions
> thereof* of this Agreement are held to be unenforceable and invalid
> by any court of competent jurisdiction, the validity and
> enforceability of the remaining provisions *or portions thereof* shall
> not be affected thereby, and each term and provision of the
> agreement shall be valid and enforceable to the fullest extent
> permitted by law.

*Id.* (alteration in original) (emphasis added).  The court proceeded to sever the null clause from

the contract "*[i]n light of* this severability clause which reflects the parties' intent."  *Id.*

(emphasis added).  The instant Release Agreement also contains a severability provision;

however, that provision differs from that of *SWAT 24* in material fashion:

> I understand and agree that, in the event that one or more of the
> provisions of this agreement, for any reason, is held by a court of
> competent jurisdiction to be invalid or unenforceable in any
> respect, such invalidity or unenforceability shall not affect any
> other provision hereof, and this agreement shall be construed as if
> such invalid or unenforceable provision had never been contained
> herein.[75]

Whereas the *SWAT 24* severability provision, relied upon by the court in its decision to

---

[75] R. Doc. No. 70-30, ex. Z.

selectively prune offending language, expressly contemplated the invalidation of a *portion* of a contractual provision, the instant severability provision contemplates only the invalidation of an entire provision.  Given *SWAT 24*'s reliance on the specific terms of the contract's severability provision, and the material difference between that provision and the instant one, the Court concludes that the holding of *SWAT 24* is not dispositive.

Finally, the Court's own research has disclosed the case of *Banner Chevrolet v. Wells Fargo Guard Services*, 508 So. 2d 966 (La. Ct. App. 4th Cir. 1997).  In that case, the defendant had contractually limited its liability "for any of [the plaintiff's] losses or damages, irrespective of origin, to person or to property, whether directly or indirectly caused by performance or nonperformance of obligations imposed by this Agreement or by negligent acts or omissions of [the defendant], its agents or employees."  *Id.* at 967.  The plaintiff argued that the acts of the defendant's employee amounted to gross fault and that, therefore, the exculpatory provision had no effect.  Though the liability waiver purported to limit liability for any losses or damages to person or property (which would include physical injury), the court proceeded to address the merits of the plaintiff's gross fault contention:  "As long as one's negligence does not cause physical injury to another, contractual provisions are valid to eliminate completely or to partially limit liability for losses due to negligence, but not for losses caused by intentional fault."  *Id.* (citing La. Civ. Code art. 2004).  Rather than striking the waiver in its entirety or to the extent it offended article 2004, the court simply found that the employee's acts did not amount to gross fault, and that a waiver of liability for damages resulting from such acts was enforceable, notwithstanding any possible overbreadth of the waiver.

Notably, the *Banner* court, in its statement of the law of article 2004, focused on the conduct of the defendant and its effect on the plaintiff, rather than on the terms of the

-29-

exculpatory provision itself.  It did not consider the language of article 2004 which demands the nullification of any clause that offends either prong.  To the extent that it did not consider such legislative language, this Court declines to follow *Banner*.

The waiver provision of the Release Agreement cannot retain its meaning once those aspects which offend article 2004 are nullified.  Mindful of the clear directive of article 2004, the Court declines to reform the meaning of the provision and limit its scope to comply with the article.  The Court, therefore, concludes that the waiver provision is null under Louisiana law, and will not operate to bar Lilith's claims against AFL.  In so ruling, the Court acknowledges the considerable force of both parties' arguments on this difficult question of interpretation.  The question is clearly a close one.  The Court notes that any jury finding not supported by sufficient evidence or any error of law may be corrected, respectively, by this Court post-verdict or by the Court of Appeals.

Because the Court concludes that the entire waiver provision is null under article 2004, it need not consider the extent to which it affects Lilith's various intentional tort and negligence claims.  All of those claims against AFL survive the waiver provision.

          d.     Substantive Law

Having concluded that the choice-of-law provision compels the application of Louisiana law to Lilith's claims against AFL, the Court must determine what law applies to her claims against AFFI and Hasson.  In their petition, plaintiffs allege that the following acts of defendants entitle Sondra and Lilith to recovery for intentional and/or negligent infliction of emotional distress: 1) confining Lilith to the OKEANOS after her father's disappearance; 2) continuing the diving trip as scheduled following the disappearances of Rubin and Ostrowiecki; 3) Hasson's

refusal to give Sondra the phone number or other access to the vessel to communicate with or retrieve her daughter; and 4) Hasson's public blaming of Lilith for her father's death.[76]  The petition alleges that the acts of defendants entitle both Sondra and Lilith to recover for their emotional distress, without further specification of which acts entitle which plaintiff to relief.[77]  Their opposition memorandum to the instant motion clarifies their position: acts 1) and 2) allegedly caused injury to Lilith; act 3) allegedly caused injury to Sondra; and act 4) allegedly injured both Lilith and Sondra.  Furthermore, plaintiffs' opposition brief appears to treat acts 1) and 2) as a single claim for emotional distress.  In other words, the Court does not understand plaintiffs to allege that, for instance, defendants' confinement of Lilith to the OKEANOS independently caused emotional injury to Sondra or that their denial of access to Sondra caused independent injury to Lilith (setting aside the question of the legal viability of these more attenuated claims).  The Court will accordingly evaluate the validity of plaintiffs' claims, and the substantive law to be applied thereto, from the perspective of the plaintiff that is claiming injury.

Lilith's claims for intentional infliction of emotional distress are twofold.  First, she seeks to recover for the distress suffered due to her alleged confinement on the OKEANOS.  Second, she seeks recovery for the injuries from Hasson's alleged public blaming of her for her father's death.  The circumstances surrounding each alleged tort are crucial in determining which substantive law applies.

i.    Confinement to the Vessel

---

[76] R. Doc. No. 1-9, Rubin second am. pet., at ¶¶ 56-57.

[77] R. Doc. No. 1-9, Rubin second am. pet., at ¶¶ 56-57.  For instance, it is unclear whether Sondra contends that the defendants' actions that were directed toward her daughter (continuing the dive trip with Lilith on the boat and publicly blaming Lilith for her father's disappearance) constitute acts that were intended to cause Sondra emotional distress.  At other times, plaintiffs refer obliquely to defendants' "cumulative actions" as the source of their injuries.  R. Doc. No. 120, mem. opp'n, at 31.

Defendants contend that state law does not govern Lilith's claims. [78]  Relying on

*Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S. Ct. 493, 34 L. Ed. 2d 454

(1972) and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock*, 513 U.S. 527, 115 S. Ct.

1043, 130 L. Ed. 2d 1024 (1995), they  argue that the "location and connection test" established

in these cases compels the application of general maritime law.   In *Grubart*, the Supreme Court

explained that:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant
> to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions
> both of location and of connection with maritime activity.  A court
> applying the location test must determine whether the tort occurred
> on navigable water or whether injury suffered on land was caused
> by a vessel on navigable water.  The connection test raises two
> issues. A court, first, must assess the general features of the type of
> incident involved, to determine whether the incident has a
> potentially disruptive impact on maritime commerce. Second, a
> court must determine whether the general character of the activity
> giving rise to the incident shows a substantial relationship to
> traditional maritime activity.

*Id.* at 534.  With respect to the location prong, this Court has held that, as a prerequisite to

asserting admiralty jurisdiction, "there must be a direct and major manifestation or impact

occurring on navigable waters."  *Barnes v. United States*, No. 96-1764, 1997 WL 149970, at *1

(E.D. La. Mar. 26, 1997) (finding no admiralty jurisdiction when "the effects of the [defendant's]

alleged negligence on the plaintiff . . . occurred entirely on land").   "In determining whether the

tort occurred on navigable water, [the] court looks to where the alleged wrong took effect rather

than to the locus of the allegedly tortious conduct."  *Egorov, Puchinsky, Afanasiev & Juring v.*

*Terriberry*, 183 F.3d 453, 456 (5th Cir. 1999); *see also N.Y. Marine and Gen. Ins. Co. v.*

*McDermott Intern. Inc.*, No. 04-2548, 2005 WL 1400450, at *6 (E.D. La. Jun. 1, 2005) (stressing

---

[78] R. Doc. No. 70-3, mem. supp., at 2 n.1, 14.

that defendant's tortious conduct "must directly produce[] a major injury on navigable waters in order to fall within a federal court's admiralty jurisdiction" (quoting *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 289 (5th Cir. 1989)) (internal quotation marks omitted) (alteration in original))).  The emphasis of the district court's location analysis is on where the injury occurred, and not where the wrongful conduct took place.  *See Egorov*, 183 F.3d at 456. Plaintiffs do not dispute that Lilith's emotional injuries from the confinement occurred while she was on the boat in navigable waters.  The location prong is satisfied.

The connection prong possesses two aspects.  First, the incident itself must have "a potentially disruptive impact on maritime commerce."  *Grubart*, 513 U.S. at 534.  Second, the "general character of the activity giving rise to the incident," here, scuba diving, must bear a substantial relationship to traditional maritime activity.  *Id.*

The disruption inquiry goes to "whether the 'general features' of the incident were 'likely to disrupt commercial activity.'"  *Id.* at 538 (quoting *Sisson v. Ruby*, 497 U.S. 358, 363, 110 S. Ct. 2892, 2896, 111 L. Ed. 2d 292 (1990)).  This aspect of the connection prong is satisfied if "the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping."  *Id.* at 539.  The incident in question is the confinement of Lilith to the vessel.  In this case, the confinement was a contributing factor to the mobilization of American, Costa Rican, and local rescue resources.  These operations were large enough in scale to potentially disrupt commercial activity in the surrounding waters.  *See id.* at 538 (stressing that the "potential effects" rather than the particular facts of the incident in question guide the court's inquiry).  The first aspect of the connection prong is, therefore, satisfied.

With respect to the second prong, the "activity giving rise to the incident" is scuba

diving, rather than the confinement of Lilith.  In *Grubart*, the Court indicated that, whereas

swimming was too attenuated an activity, "[n]avigation of boats in navigable waters clearly falls

within the substantial relationship."  *Id.* at 540.  "The substantial relationship test is satisfied

when at least one alleged tortfeasor was engaging in activity substantially related to traditional

maritime activity and such activity is claimed to have been a proximate cause of the incident."

*Id.* at 541.  Meanwhile, the meaning of "traditional maritime activity" has been interpreted

broadly, and "extends at least to any other activities traditionally undertaken by vessels,

commercial or noncommercial."  *Sisson*, 497 U.S. at 367.

In *Courtney v. Pacific Adventures, Inc.*, 5 F. Supp. 2d 874 (D. Haw. 1998), the court

found that a diving accident satisfied the substantial relationship test of the *Grubart* connection

prong.  After completing a dive, the plaintiff's limbs were ensnared in the dive boat's propeller,

causing serious injuries.  *Id.* at 876.  The court found that the allegations involved "the operation

of a vessel and the failure to administer first aid," which "establish[ed] a substantial relationship

with maritime activity.  *Id.* at 878.  Though the diving accident in *Courtney* involved direct

contact between the boat and diving victim, the Court follows that case's reasoning and

concludes that the accident in this case was substantially related to the traditional activities of

navigable vessels. Plaintiffs' claims include allegations directly related to the operations of

defendants' vessels, specifically the dive skiff and the OKEANOS itself.

Both aspects of the connection prong of the *Grubart* test are satisfied.  Accordingly,

general maritime law will be the substantive law applied to Lilith's IIED claim against AFFI and

Hasson based on her alleged confinement to the vessel after the accident.

ii.      Public Blaming

-34-

Defendants assert that all of Lilith's emotional distress claims "actually are maritime law claims."[79]  Though defendants go on to argue why maritime law should apply to the confinement of Lilith to the vessel, they do not so argue that it applies to the alleged public blaming by Hasson.[80]  If maritime law does not apply — which it almost certainly does not because there is no allegation that the injury occurred on navigable waters, *see Egorov*, 183 F.3d at 456 — the parties propose no body of law other than Louisiana law.  Indeed, in contesting the blaming claim on the merits, defendants exclusively cite Louisiana authority.  As a result, the Court understands defendants to consent to the applicability of Louisiana law to Lilith's public blaming claim against AFFI and Hasson

### 2.    Sondra's Claims

Defendants argue that Sondra's claims are subject to general maritime law under *Grubart*'s location and connection test.[81]  Plaintiffs respond that, like Lilith, Sondra's claims are subject to the choice-of-law provision in the Release Agreement and, therefore, governed by Louisiana law.[82]

Unlike Lilith, Sondra did not execute the Release Agreement and is not a party to any contract with defendants.  The choice-of-law provision does not bind defendants to submit to

---

[79] R. Doc. No. 70-3, mem. supp., at 2 n.1.

[80] Defendants argue that the alleged confinement of Lilith, direction to the crew to continue the diving trip, and the actions giving rise to the bystander damages claim fall within the *Grubart* location and connection test, but defendants are silent with respect to her public blaming claim.  R. Doc. No. 70-3, mem. supp., at 14-15.

[81] R. Doc. No. 71-3, mem. supp., at 7 n.4.  Defendants subject Sondra's bystander damages claims to the *Grubart* analysis, but provide no argument why her IIED and NIED claims satisfy that test.  They merely "deny that Louisiana law applies to Sondra Rubin's claims, for the reasons set forth fully above."  However, nowhere do they provide express reasons why the general maritime law should apply to the IIED and NIED claims.

[82] R. Doc. No. 120, mem. opp'n, at 39-42.

Louisiana substantive law when the opposing claimant is not a contracting party.  Plaintiffs cite

no case which would give a choice-of-law provision such expansive effect.  The question then is

whether the alleged torts are sufficient to meet the *Grubart* location and connection test and

trigger the application of maritime law.

There is no evidence that Sondra was ever on navigable waters, let alone that her alleged

emotional injuries occurred on navigable waters.  The circumstances here do not satisfy the

location test of *Grubart*; accordingly, there is no need to consider the second prong of that test,

whether there is sufficient connection to maritime activity.  As the sole alternative to maritime

law, both parties argue the merits of Sondra's claims under Louisiana law.  The Court takes

defendants to consent to the application of Louisiana law when, as here, maritime law is found

not to apply.  As a result, the Court will apply Louisiana law to Sondra's claims for emotional

distress.

C.      *Intentional Infliction of Emotional Distress*

Under Louisiana law, an intentional infliction of emotional distress claim requires that 1)

the conduct of the defendant be "extreme and outrageous;" 2) the plaintiff suffer severe

emotional distress; and 3) the defendant desire to inflict the emotional distress or know that

severe emotional distress would be substantially certain to result from his conduct.  *White v.

Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).  "Louisiana courts have staunchly adhered to

the standard established in *White*."  *LaBove v. Raftery*, 802 So. 2d 566, 578 (La. 2001).

In order to be "extreme and outrageous," the conduct "must be so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious and utterly intolerable in a civilized community.  Liability does not extend

-36-

to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *White*, 585 So. 2d at 1209.  "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Id.* at 1209-10 (citing RESTATEMENT (SECOND) OF TORTS, comment d, § 46).  "The defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered." *Id.* at 1210.  "[P]roving outrageous conduct by the defendant" is a "heavy burden" to be met by the plaintiff. *Succession of Harvey v. Dietzen*, 716 So. 2d 911, 917 (La. Ct. App. 4th Cir. 1998).

Second, "[t]he distress suffered must be such that no reasonable person could be expected to endure it." *White*, 585 So. 2d at 1210. "Liability arises only where the mental suffering or anguish is extreme." *Id*.

Finally, the intent element requires that the defendant either 1) desire to inflict severe emotional distress or 2) know that severe emotional distress is certain or substantially certain to result from his conduct.  *White*, 585 So. 2d at 1209.  Subjective intent may be presumed from the circumstances. *Taylor v. State*, 617 So. 2d 1198, 1204-05 (La. App. 3 Cir. 1993).  "The susceptibility of a particular plaintiff should be taken into account whether the defendant intended or negligently inflicted severe emotional distress." *Harvey*, 716 So. 2d at 917; *Scamardo v. Dunaway*, 650 So. 2d 417, 419 (La. App. 5 Cir. 1995).  The conduct must be intended or calculated to cause severe emotional distress and not some lesser degree of fright, humiliation, embarrassment, worry, or the like. *White*, 585 So. 2d at 1210.

**1.     Lilith's IIED Claims**

    a.     Confinement to the OKEANOS

With respect to Lilith's IIED claim against AFFI and Hasson for confinement to the vessel, the Court applies general maritime law. The Ninth Circuit has held that causes of action for emotional distress exist under the general maritime law. *See Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 841 (9th Cir. 2002) ("[W]e have held that claims for emotional distress are cognizable under admiralty law . . . ."); *see also Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 132 (3d Cir. 2002) (citing *Wallis* and recognizing, without reaching the merits, an IIED claim under maritime law). In *Wallis*, the court looked to the RESTATEMENT (SECOND) OF TORTS for guidance in measuring the sufficiency of the plaintiff's emotional distress claim. The Louisiana Supreme Court did the same in the *White* case, its seminal ruling on intentional infliction of emotional distress. *See White*, 585 So. 2d at 1209 (La. 1991) (affirming the viability of the cause of action "generally in accord with the legal precepts set forth in the Restatement text and comments"). Therefore, with respect to Lilith's emotional distress claims against AFFI and Hasson for confinement on the vessel, those claims are governed by the same standards applicable under Louisiana law. Accordingly, the Court will apply Louisiana law uniformly to evaluate the sufficiency of Lilith's confinement IIED claim as against all three movant defendants, AFL, AFFI, and Hasson.[83]

### i.    Extreme and Outrageous Conduct

Defendants contend that their conduct was not outrageous because they were merely complying with Lilith's desire to be left on the vessel.[84] Plaintiffs respond that defendants' actions were outrageous in light of Lilith's apparent desire to be with her mother, and that the

---

[83] The Court notes that defendants, although insisting that maritime law, rather than Louisiana law, applies to plaintiffs' IIED claims, provide no analysis of the claims under maritime law. *See* R. Doc. No. 70-3, mem. supp., at 2-3; R. Doc. No. 71-3, mem. supp., at 10-11.

[84] R. Doc. No. 70-3, mem. supp., at 3-6.

decision to keep Lilith on the ship engendered resentment from other passengers.  They further dispute defendants' characterization of Lilith's state of mind, arguing that she clearly expressed her desire to leave the ship.[85]  Defendants' knowledge of Lilith's desire to leave the ship would amplify the outrageousness of their alleged conduct.   To support their argument that Lilith's failure to complain is fatal to her IIED claim, defendants cite *Smith v. Ouachita Parish School Board*, 702 So. 2d 727 (La. Ct. App. 2d Cir. 1997).  In *Smith*, the court found that an IIED claim would not lie when "a reasonable person . . . would have complained" about her treatment at the hands of the defendants.  *Id.* at 735.  In this case, however, there is a genuine dispute over whether Lilith did voice her complaints to defendants, and whether they knew of her desire to leave the ship.[86]  The Court concludes that plaintiffs have identified a genuine issue of material fact with respect to the outrageousness of the alleged conduct.

ii.      Severe Distress

Through deposition testimony, plaintiffs have brought forth evidence of the extent of Lilith's suffering due to the confinement.[87]  Lilith herself stated that she was in "the most extreme emotional state."[88]  Defendants' main contention is that Lilith did not consult a psychologist or psychiatrist following her father's death, demonstrating the nonsevere nature of her suffering.[89]  In *Blair v. Tynes*, 621 So. 2d 591 (La. 1993), the plaintiff's IIED claim was

---

[85] R. Doc. No. 120, mem. opp'n, at 21.

[86] R. Doc. No 114-7, Nathan Purdee deposition, at 68-69; R. Doc. No. 114-8, David Gibson deposition, at 79-80.

[87] R. Doc. No. 114-7, Nathan Purdee deposition, at 69; R. Doc. No. 114-8, Carla Gibson deposition, at 77-79.

[88] R. Doc. No. 114-6, Lilith Rubin deposition, at 84.

[89] R. Doc. No. 70-3, mem. supp., at 12-13.

upheld "without presenting proof of a clinical diagnosis." *Id.* at 601.  A reasonable person test applies to whether an injured plaintiff's suffering is sufficient to support a claim.  *Id.* at 600.  This Court follows the ruling in *Blair* that a doctor's diagnosis is not strictly required to substantiate an IIED claim.  Given the considerable testimony proffered by plaintiffs to support the severity of the distress suffered by Lilith, the Court concludes that plaintiffs have created an issue of material fact sufficient to survive summary judgment.

iii. Intent to Cause Distress

Judging defendants' conduct in light of the prevailing circumstances, including the recent death of Rubin, there is evidence to support the allegations that defendants "knew that severe emotional distress would be certain or substantially certain to result from [their] conduct."  *See White*, 585 So. 2d at 1209 (La. 1991).  "The defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered."  *Id.* at 1210.  The dispute surrounding defendants' alleged knowledge of Lilith's desire to leave the ship, coupled with a reasonable presumption of susceptibility to distress, create a genuine issue of material fact to be resolved by the fact finder at trial.  The Court, therefore, concludes that Lilith has demonstrated a claim for IIED sufficient to survive defendants' summary judgment motion.

b. Hasson's Public Blaming

Defendants argue that Hasson's statements appearing in the Tico Times do not rise to the level required for an IIED claim.[90]  Initially, they deny that Hasson ever blamed Lilith for her father's death.  They further argue that Hasson's words, although perhaps harsh, are not enough

---

[90] R. Doc. No. 70-3, mem. supp., at 8.  Defendants have argued for summary judgment with respect to Hasson's alleged public blaming as to Lilith's claim, but not as to Sondra's.  Given plaintiffs' petition's lack of clarity in assigning claims to Sondra and Lilith, however, the Court treats defendants' argument with respect to Lilith as applying to Sondra as well.

-40-

to constitute extreme and outrageous conduct.  Finally, in some tension with their earlier denial, defendants suggest that Hasson's statements are not untrue.[91]  Plaintiffs respond that Hasson's statements, particularly given their context in a public newspaper, are extreme and outrageous enough to support Lilith's and Sondra's claims.[92]

> i.      Extreme and Outrageous Conduct

The Court must resolve whether Hasson's statements, if made and if true, which is disputed by the parties, constitute conduct that can support the first element of an IIED claim. Defendants cite *Guilbeaux v. Times of Acadiana, Inc.*, 693 So. 2d 1183 (La. Ct. App. 3d Cir. 1995), and *Beaudoin v. Hartford Accident & Indemnity Company*, 594 So. 2d 1049 (La. Ct. App. 3d Cir. 1992), for the proposition that "[h]arsh words . . . do not necessarily constitute extreme and outrageous conduct."[93]  In *Guilbeaux*, the plaintiff and defendant were contemplating partnering in a business venture.  The defendant had allegedly defamed the plaintiff in a local newspaper and to various individuals by stating the plaintiff had made threats and was a dangerous and violent man.  *Id.* at 1185.  The court ruled that defendant's conduct was not sufficiently outrageous to support plaintiff's claim.  *Id.* at 1187.

In *Beaudoin*, the plaintiff's work supervisor "constantly raised his voice to her, cursed, called her names such as dumb and stupid, went into violent, screaming rages, and made statements about her appearance, such as calling her fat."  *Beaudoin*, 594 So. 2d at 1050.  The supervisor contradicted this testimony by stating that he never directed his statements toward

---

[91] R. Doc. No. 70-3, mem. supp., at 7-11.

[92] R. Doc. No. 120, mem. opp'n, at 24-27.

[93] R. Doc. No. 70-3, mem. supp., at 8.  Defendants also cite *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002).  In *Wallis*, the speaker's statement was merely overheard by the plaintiff, rather than broadcast in a public newspaper and read by the plaintiff, as in this case.  *See Wallis*, 306 F.3d at 842.

plaintiff.  *Id.* at 1051.  The court deferred to the trial judge's finding for the defendant on the contradictory testimony, and held that "the supervisor's conduct was [not] of such an extreme and outrageous nature as to give rise to a cause of action for an intentional tort."  *Id.* at 1052.

The relationship between defendants and Lilith was already strained when the statements were published.  These circumstances are clearly distinguishable from the businessmen considering a partnership at arm's length in *Guilbeaux* or the employee/employer antagonism at issue in *Beaudoin*.[94]  "The defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered."  *White*, 585 So. 2d at 1210.  Considering the evidence presented by plaintiffs, the Court finds that a genuine issue of material fact exists as to whether Hasson's statements were extreme and outrageous conduct.

ii.      Severe Distress

In her declaration, Lilith avers that being blamed for her father's death was "traumatizing" and led her to endure emotional distress for the five years since the alleged incident.[95]  Plaintiffs have provided sufficient evidence of Lilith's suffering as a result of the alleged blaming to survive summary judgment.  The Court concludes that the record discloses sufficiently extreme mental suffering for Lilith to present her claim to a jury.  *See White*, 585 So. 2d at 1210.

iii.      Intent to Cause Distress

The Court agrees with plaintiffs that, judging defendants' conduct in light of the

---

[94] As a litigant in an employer/employee case, the *Beaudoin* plaintiff was subject to a stricter IIED standard. Louisiana law requires IIED claims in the workplace context to allege "a pattern of deliberate, repeated harassment over a period of time."  *Beaudoin*, 765 So. 2d at 1026.

[95] R. Doc. No. 278-2, ex. A, Lilith decl., at ¶¶4-5.

circumstances, including the recent death of Rubin, there is evidence to support the allegations that defendants "knew that severe emotional distress would be certain or substantially certain to result from [their] conduct."  *See White*, 585 So. 2d at 1209 (La. 1991).  Plaintiffs allege that defendants remained aware of Lilith's susceptibility to emotional injury throughout the period immediately following Rubin's disappearance.  On the current record, the Court cannot state definitively that defendants did not intend to cause severe emotional distress or know that such distress was substantially certain to result.  This is a question of fact to be resolved at trial.  Lilith has created genuine issues of material fact on each of the three elements of an IIED claim with respect to Hasson's alleged public blaming.

### 2.      Sondra's IIED Claims

#### a.      Denial of Access and Phone Number to the OKEANOS

##### i.      Extreme and Outrageous Conduct

Defendants argue that preventing Sondra from accessing the vessel, either in person or by calling the satellite telephone, in order to retrieve or communicate with Lilith does not rise to the level of conduct required to support an IIED claim.[96]  Plaintiffs claim that the circumstances gave defendants "the ability to regulate Sondra's access to her daughter," thereby putting them in a position of power able to affect her interests.[97]  Plaintiffs further allege that since defendants were aware that Rubin had just disappeared, they were aware of a circumstance that would make Sondra more susceptible to emotional distress.[98]  *See White*, 585 So. 2d at 1210.

---

[96] R. Doc. No 71-3, mem. supp., at 11-12.

[97] R. Doc. No. 120, mem. opp'n, at 19.

[98] *Id.* at 19-20.

Hasson allegedly misrepresented the degree of authority he had to control access to the vessel.[99]  Further, Hasson allegedly refused to provide the OKEANOS's satellite phone number until May 21, 2003.  However, Hasson himself encouraged Lilith to communicate with her mother using the OKEANOS satellite phone.[100]  Indeed, Sondra admitted that Hasson informed her that the vessel's satellite phone was reserved for ongoing communications with the United States Navy.[101]  Finally, Sondra testified that Hasson's proffered reason for refusing to return to shore — that the search efforts were ongoing — was later shown to be false, as the OKEANOS allegedly discontinued search efforts at 1:00 a.m. on May 17, 2003.[102]

Based on the state of the record before this Court, summary judgment is not appropriate at this stage.  However, mindful of the fact that actionable conduct must be "so atrocious that it crosses the line of decency and is intolerable to a civilized society," *Guilbeaux*, 693 So. 2d at 1187, the Court has doubts whether Sondra can meet that threshold at trial.  The conflicted state of the record, though, makes it preferable for the Court to hear evidence and correct any verdict post-trial if necessary.

ii.      Severe Distress

Referring to the Sunday after the disappearance, Sondra testifed that she "[didn't] know how [she] lived through that day."[103]  The Court prefers to allow evidence to be presented to the

---

[99] The Court agrees with plaintiffs that Sondra's alleged superior access to resources which would give her the ability to reach the vessel is irrelevant to the question of whether defendants' conduct was extreme and outrageous.

[100] R. Doc. No. 173-3, ex. 5, Hasson deposition, at 232-33.

[101] R. Doc. No. 114-5, ex. A, Sondra dep., at 97.

[102] R. Doc. No. 71-9, ex. E, Sondra dep., at 102-03.

[103] R. Doc. No. 71-9, ex. E, Sondra dep., at 98.

jury and correct any unsupported verdict post-trial, if necessary.  Therefore, the Court concludes Sondra has made sufficient allegations to satisfy this element and preclude summary judgment.

### iii.    Intent to Cause Distress

Again, judging defendants' conduct in light of the circumstances, there is evidence to support the allegations that defendants "knew that severe emotional distress would be certain or substantially certain to result from [their] conduct."  *See White*, 585 So. 2d at 1209 (La. 1991).  On the current record, the Court cannot state definitively that defendants did not intend to cause severe emotional distress or, at least, know that such distress was substantially certain to result.  Sondra's IIED claim for denial of access to the vessel survives summary judgment, though the Court remains mindful of the heavy evidentiary burden plaintiffs must carry at trial to satisfy the legal requirements.

### b.    Hasson's Public Blaming

### i.    Extreme and Outrageous Conduct

The Court adopts the analysis set forth above with respect to Lilith's claim for the public blaming.  As above, it concludes that Sondra has created a genuine issue of material fact on this element of an IIED claim.

### ii.    Severe Distress

Defendants contend that Sondra's distress did not rise to the level required for an IIED claim.  They stress the fact that Sondra has not produced a report from a mental health professional documenting her alleged injury.[104]  Sondra alleges that she "didn't know whether to

---

[104] R. Doc. No 71-3, mem. supp., at 18.

die or kill" when she became aware of the Tico Times article containing Hasson's statements.[105] Legally cognizable "emotional distress . . . goes well beyond simple mental pain and anguish." *Lejeune v. Rayne Branch Hosp.*, 556 So. 2d 559, 570 (La. 1990).  "The emotional distress suffered must be to an extent that no reasonable person could be expected to endure it."  *Smith v. Ouachita Parish Sch. Bd.*, 702 So. 2d 727, 736 (La. Ct. App. 2d Cir. 1997).

Contrary to defendants' argument, a "plaintiff need not present proof of a clinical diagnosis" in order to recover for mental anguish.  *Declouet v. Orleans Parish Sch. Bd.*, 715 So. 2d 69, 80 (La. Ct. App. 4th Cir. 1998) (construing article 2315.6, the Louisiana bystander damages statute).   Instead, "the reasonable person standard applies to determine whether emotional distress supports recovery."  *Id.*  That Sondra allegedly "had litigation and economic considerations on her mind"[106] does not necessarily preclude a finding of severe emotional distress. Indeed, such distress could have plausibly contributed to those considerations taking prominence in Sondra's thought process.  Given Sondra's testimony as to her state of mind when she learned about Hasson's blaming of Lilith, the Court concludes that the level of distress is a question of fact to be resolved at trial.

### iii.      Intent to Cause Distress

The Court adopts the analysis set forth above with respect to Lilith's claim for the public blaming.  As above, it concludes that Hasson's conduct satisfies the intent element. Accordingly, Sondra has raised a genuine issue of material fact on all three elements of her IIED claim and will be permitted to submit her claim to the jury at trial.

---

[105] R. Doc. No. 114-4, ex. A., Sondra Rubin deposition, at 139.

[106] R. Doc. No. 71-3, mem. supp., at 18

D.      *Negligent Infliction of Emotional Distress*

Under Louisiana law, recovery for NIED is pursuant to Louisiana Civil Code article 2315, which provides:  "Every act of man whatever that causes damage to another obliges him by whose fault it happened to repair it."  *See Powell v. Brookshire's Grocery Co.*, 705 So. 2d 286, 291 (La. Ct. App. 1997).  "It is well established in [Louisiana] jurisprudence that a claim for negligent infliction of emotional distress unaccompanied by physical injury is viable."  *Id.*  In order for liability to attach under an article 2315 duty-risk analysis, the plaintiff must prove:

> (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendants' substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was the legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element).

*Powell*, 705 So. 2d at 292 (*citing Mathieu v. Imperial Toy Corp.*, 646 So. 2d 318, 322 (La. 1994); *Barrino v. E. Baton Rouge Sch. Bd.*, 697 So. 2d 27, 33-34 (La. Ct. App. 1st Cir. 1997)). Furthermore, recovery for NIED is limited to cases "involving especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious."  *Moresi v. State ex. rel. Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1096 (La. 1990).

1.      **Lilith's Claims**

Lilith waived her NIED claims against defendants AFFI and Hasson pursuant to the waiver provision of the Release Agreeement.  Her NIED claims against AFL, however, were not subject to waiver because that provision was invalidated by article 2004 of the Louisiana Civil

Code.  Pursuant to the choice-of-law provision governing Lilith's claims against AFL, the Court

proceeds to evaluate those claims under Louisiana law.

      a.     Confinement to the Vessel

Defendants argue they had no duty not to confine Lilith to the vessel, and no

corresponding duty to bring her ashore.  They rely on the assertion that they lacked control over

the vessel because they did not own or operate it.[107]  Plaintiffs dispute this assertion, contending

that defendants, through Hasson, could exercise control over the OKEANOS's operations.[108]

Plaintiffs have created a genuine issue of material fact on the question of whether AFL had

operational control over the vessel.  Because vessel owners and operators owe their passengers a

duty of ordinary care, a duty has been established in this case.  *Cf. Parker v. Sw. Offshore Corp.*,

763 So. 2d 638, 643 (La. Ct. App. 2d Cir. 1999); *Adams v. Chevron U.S.A., Inc.*, 589 So. 2d

1219, 1222-23 (La. Ct. App. 4th Cir. 1991).  Meanwhile, on the current record, a reasonable jury

could find that AFL breached this duty by the decision of its employee, Hasson, to continue the

diving trip.

The Court further finds that the alleged emotional injuries suffered by Lilith fell within

the "scope of protection" created by AFL's duty.  *Powell*, 705 So. 2d at 292.  The very reason

that the law demands that vessel operators and owners exercise reasonable care toward their

passengers, particularly those already in fragile emotional condition, is to avoid the kind of

severe distress alleged by Lilith.

Lilith has alleged sufficient suffering to support her IIED claim for confinement and the

---

[107] R. Doc. No. 70-3, mem. supp., at 17-18.

[108] R. Doc. No. 120, mem. opp'n, at 33; *see* D. Gibson dep., ex. N, at 19-20; K. Chetron dep. ex. O, at 82.

Court finds no reason to reach a different conclusion for her NIED claim against AFL.  Lilith's claim for NIED based on her alleged confinement to the OKEANOS is sufficient to preclude summary judgment.

> b.  Public Blaming

Plaintiffs cite the concurring opinion in *Bacas v. Falgoust*, 760 So. 2d 1279 (La. Ct. App. 5th Cir. 2000) for the proposition that a duty is owed to a plaintiff in a vulnerable emotional state.  *Id.* at 1282 (McManus, J., concurring).  By analogy to the Louisiana Supreme Court's ruling in the IIED context in *White v. Monsanto Co.*, the Court finds that a defendant's knowledge "that plaintiff is particularly susceptible to emotional distress" must be considered in determining whether a duty exists.  *White*, 585 So. 2d at 1210.  Because defendants were aware of Lilith's vulnerable emotional state, they had a duty not to exacerbate or aggravate that condition.  Meanwhile, as discussed above in the IIED context, Lilith's declaration raises a genuine question of material fact whether Hasson's statement created an "especial likelihood of genuine and serious mental distress."  *Moresi*, 567 So. 2d at 1096.  Similarly, cause-in-fact and damages are supported by Lilith's allegations in the record.

The remaining inquiry is whether "defendant's substandard conduct was the legal cause of the plaintiff's injuries."  *Powell*, 705 So. 2d at 292.  "The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner."  *Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 294 (La. 1993).  "[T]he proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced."  *Id.*

The Court concludes that plaintiffs' allegation — Hasson's blaming of Lilith for her

father's death — is precisely the sort of harm, exacerbation of a fragile emotional condition, that AFL's duty was designed to prevent.  Lilith has, therefore, with respect her NIED claim, created a genuine issue of material fact with respect to the alleged public blaming.

### 2.      Sondra's Claims

Sondra argues that defendants owed her an independent duty not to cause her emotional distress because: 1) defendants controlled Sondra's access to her daughter, and defendants were, therefore, in a position of power and control over her and 2) the defendants knew that Sondra was in a vulnerable emotional state and, therefore, owed her a duty not to exacerbate her distress.[109]  The defendants argue that they did not owe any duty to Sondra because: 1) Sondra was not a passenger on the OKEANOS; 2) the defendants had no contractual relationship with Sondra; and 3) the defendants did not own or operate, nor did they have control of the OKEANOS.[110]

#### a.      Denial of Access

With respect to defendants' alleged denial of access to the vessel, the Court concludes that defendants had a duty not to exacerbate Sondra's fragile emotional condition, of which they were aware.  *See Bacas*, 760 So. 2d at 1282 (McManus, J., concurring).  As discussed above in the IIED context, the alleged acts of defendants caused Sondra such turmoil that she stated that she "[didn't] know how [she] lived through that day."[111]  She further stated that, two days after the incident, she was "terrified" on behalf of her daughter, who she felt was "in the ocean" along

---

[109] Rec. Doc. No. 120, p. 32-34.

[110] Rec. Doc. No. 71-3, p. 22.

[111] R. Doc. No. 71-9, ex. E, Sondra dep., at 98.

with her husband.[112]  Further, these alleged emotional injuries, if substantiated at trial, are the type of harm that defendants' duty is designed to prevent.  Again, the Court acknowledges the heavy burden carried by a plaintiff alleging NIED, but prefers to correct any improper verdict post-trial, after evidence has been presented to the jury.

b.    Public Blaming

The Court adopts the above analysis regarding Lilith's NIED claim for the alleged public blaming by Hasson.  It concludes that defendants had a similar duty with respect to Sondra, which was breached when Hasson allegedly blamed Lilith for her father's death.  Sondra's testimony regarding her emotional state after learning of the article is sufficient to meet the *Moresi* standard.  For these reasons, Sondra's NIED claim survives summary judgment.[113]

Accordingly,

**IT IS ORDERED** that defendants' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART**.

The motions are **GRANTED** in the following respects:

Sondra's and Lilith's claims for bystander damages pursuant to La. Civil Code Ann. article 2315.6 are **DISMISSED WITH PREJUDICE**.

Lilith's claims for negligent infliction of emotional distress against defendants AFFI and

---

[112] R. Doc. No. 120, ex. A., Sondra dep., at 105.

[113] Notably, the state appellate court affirmed on appeal the trial court's denial of defendant's exception of no cause of action with respect to plaintiffs' IIED and NIED claims.  The court stated that "it appears that these allegations are sufficient to state a claim for intentional and/or negligent infliction of emotional distress. . . . [T]he totality of facts pled appear sufficient to withstand an exception of no cause of action."  *Ostrowiecki v. Aggressor Fleet, Ltd.*, 965 So. 2d 527, 539 (La. Ct. App. 1st Cir. 2007).  Though the case is presently in a different posture, the Court notes the consistency of its disposition of defendants' motions with the state court's prior ruling.

Hasson are **DISMISSED WITH PREJUDICE**.

The motions are **DENIED** in all other respects.

New Orleans, Louisiana, August 15, 2008.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**